Third case for argument this morning is United States v. Webb. Mr. Ilitch. Good morning. May it please the court. My name is Niles Ilitch and I represent the appellant Gregory Webb. This court should reverse the jury's verdict because the evidence does not support the jury's findings. Specifically, reversal is required because based on the evidence received by the jury, no rational juror could have found the required elements of the offenses as alleged in the indictment. This case involves 11 counts and 9 convictions, but our arguments in our brief and argument this morning are the same for each count, and so we'll make the arguments together. In our first argument this morning, we argued that the evidence is insufficient to support the verdict because the individual verdicts rely on the collective memory of the witnesses rather than any specific memory. This collective memory prevented any rational juror from finding that Mr. Webb made some particular statement, that the witness or the investor heard that statement, and that the witness or the investor acted on that specific statement. This trial occurred years after many of these investments were made, and perhaps for that reason the government made it a point to ask each witness that testified whether they had an individual memory of the phone calls that they listened to or whether they had this general collective memory. Every witness testified that they had a collective memory rather than an individual memory, some more than others, but they all relied on a collective memory. A collective memory is insufficient. It's insufficient because the record establishes that each of these investors listened to calls both before and after making an investment. Because the investors either did not or could not differentiate between calls they heard before they invested and calls after they invested, the evidence of what they collectively remember about the calls cannot support the verdict. And it can't support the verdict because no rational juror could have found the required elements of the offense based on phone calls listened to months after the investor put money into the company. Now, as this Court knows, the Supreme Court in Nieder established that in order to show a scheme to defraud, that there must be some specific statement that either did or was able to influence the decision to make the specific investment. It is irrational for any juror to have concluded that a statement made after an investment was in fact made influenced the decision to make that investment. Therefore, this idea of this collective memory of these phone calls is insufficient to support the jury's finding, and reversal is required. In our second argument, which is closely related to our first argument, we again address this issue of collective memory. As a preliminary matter, we don't know how many of these phone calls there actually were. But we do know that each and every investor testified that they only listened to some fraction of these calls. No investor testified that they listened to all of the calls. For the government to prevail in this case, it had to have established that there was some materially false statement. But without knowing what calls the investor listened to, and without knowing what was said in subsequent calls, we can't know if some past statement was in fact materially false, even if we could be sure that some specific investor heard some specific call. The reason for this is that it's difficult, if not impossible, to look at a statement without context and to determine whether it's materially false. So a statement that might have been, I don't want to use a double negative here, but not materially false, say in 2007, might have been materially false in 2011 if it had been repeated. Each of these victims testified that they invested because of the assurances from your client that contracts were in place and that the so-called Womhoff funding was forthcoming. Yes, Judge Sykes. So they gave the jury those factual bases for finding that it was your defendant's lulling statements that led them to invest. Why isn't that enough? Why do they have to pinpoint the dates of the calls? I'm sorry for the interruption. I don't think I would characterize it quite that way. My understanding of the record as I've been through it and written this brief and lived with this for probably longer than I would like is that what these investors said is they had a collective memory of what they were told, and they invested sort of based on that collective memory, and they couldn't tell us when they heard that there was a contract in place. They couldn't tell us when they heard about this Treasury bonds stuff that was going to bring in, I think, $8 billion to the company. They couldn't tell us when they heard that relative to when they made the investment. So if they heard it after they made the investment, it doesn't matter because it doesn't influence their decision to make the investment, and they couldn't or didn't differentiate between what they heard before they invested and what they heard after they invested. So they say they have this collective memory, this general notion of what they remember from these calls, but they do not distinguish between what they heard before they invested and what they heard after they invested. Were they instructed under Pattern Instruction 4.05 from the Seven Circuit Pattern Instructions? That's the one that indicates that the indictment charges the crime occurred on or about a certain date. The government must prove that the crime happened reasonably close to that date. The government is not required to prove the crimes happened on those exact dates. Yes, Judge Reagan, they were instructed on that. So would we have to conclude that they didn't follow the court's instruction to buy your theory that this was collective memory? No, Judge Reagan, I don't think you have to do that. And the reason you don't have to do it, and I understand that this on or about has considerable flexibility to it, in fact, but what we have here are witnesses who say this is what we remember about the calls that we heard. We listened to maybe 12 to 15 calls over a two-year period. This is what we remember, and we invested $10,000. The indictment says the – I'm just making up a number, $10,000. The indictment says the investment occurred on or about April 1, 2015, whatever it is. So the date that the investment occurred is what factors into the on or about. But the problem here and the deficiency here is that we don't have any idea about what they heard before they invested  and it's a distinction that I think is critical here because if they hear something after they invested, it has no influence on their decision to invest, which is an element of this offense. So if they hear about it after the fact, it isn't relevant. And so what should have happened here is that the question should have been tell us about why you invested. Why did you invest in this company? What led you to invest in this company? Not tell me about the phone calls that you listened to, the conference calls that you listened to, which was the nature of the questions on direct examination. So because we can't distinguish between the two, I don't think the issue of on or about really ties into this. The jury got that instruction that that deals with when the money actually went to them, but the issue that I'm trying to raise to the court this morning is that it's not about when the money actually transferred in but about what the individual investor knew or believed before they invested their money. I think I was about to start my second argument. My second argument continues this theme of the collective memory, and it says that we don't know how many calls there were, but we do know that every investor testified that they only listened to a fraction of the calls that were made. For the government to prevail, it had to have a materially false statement, but without knowing what calls the investor listened to, we don't know which of the calls they listened to and what was said in subsequent calls. We can't know if some past statement was, in fact, materially false, and the reason is that these are presented without context. What happened here was they put all the statements in the same pot, and the government pulls one out, and they say that Webb said X at some point. At some point, X was, in fact, materially false. Therefore, every time Webb said X, it was materially false. Well, that doesn't work. What we have to know is the context that surrounds these statements,  Now, the government's response to this is sort of a collective, so what? It doesn't matter. And their reason for this is to say that there's a general pattern of criminal conduct that's occurring here and that every investment that went into this company was, in fact, a criminal act. This is exactly the argument that this court rejected in Durham, 766 F. 3rd, 678. In Durham, there were really two issues there. The court rejected that argument because, one, there was no evidence that the entire company existed for the purpose of perpetrating this fraud, and, two, the argument wasn't brought up at trial, so there was no opportunity to defend it. This court called it a Hail Mary. That's exactly what we have in this instance, a Hail Mary arguing that there is a general pattern of criminal conduct. Everything that went on with this company was fraudulent, and, therefore, all this stuff I've talked about doesn't matter. But that wasn't the government's case. The government's case at trial was that this started out as a legitimate company. At some point, it ran out of money. It stopped. It didn't have enough capital. And at that point, it switched from being a legitimate company to acting fraudulently. So there was no evidence that establishes that the entire company existed simply for the purpose of perpetrating a fraud, and, in fact, the government conceded to the opposite. Therefore, as in Durham, the government's argument is not persuasive. The evidence is insufficient, and reversal is required. May I say that, Justice Reagan? Are you abandoning the restitution argument? I don't like to do that, but I think that we don't clear plain error on that, and so. It wasn't raised. Yes, yes. Thank you. Thank you, counsel. Thank you for the elevation to being a justice. Ms. Holman. Good morning, and may it please the Court. Rebecca Holman on behalf of the United States. The jury's verdict in this case was supported by ample evidence, which included an avalanche of statements by the defendant concerning everything that mattered to the investors, the existence of contracts for products and services, the expected large capital investments that were always imminent, and the state of the technology that the company was founded on. The evidence demonstrated that these false statements began as early as 2005 and continued, in fact, continuing even after the state of Illinois had issued a prohibition order for the defendant to cease selling shares of the company. Contrary to the defendant's argument, there was ample evidence as to when these statements were made and that the investors relied on them. Specifically, there were dates attached to the statements that were recorded in writing, the offering memoranda, the executive summaries. There were also recorded conference calls, and the question wasn't which conference call an investor listened to, but what the statements that they heard were and when they heard them. And there was ample evidence that investors heard these false misrepresentations prior to making their investments, as well as after. And all of them are false from the get-go, because by the time you began courting these investors, this venture was already failed, as I understand it. Yes, that's right. The government's evidence at trial showed that at the beginning of 2007, the company only had $38,000 in cash on hand at that time and no contracts or imminent contracts or capital investment forthcoming. Right, so it wasn't as if the representations were truthful at one point and became untruthful later. They were all false from the get-go, so the dates really don't matter. I'm not sure that's exactly right, because when the company started and the government made this argument at trial, it may not have been fraudulent from day one. There were good intentions there. However, it was soon clear that the company was going to fail, and so the government's evidence at trial showed that as early as 2005, the defendant was making false statements about contracts that had been secured. Investors relied on these false statements. Two hundred investors or more lost over $9 million, and drawing all reasonable inferences in the light most favorable to the government, there's no question that a rational trier of fact could have found that the elements of the crime were proven beyond a reasonable doubt. In terms of the collective memory issue that was raised by the defendant, of course the court will not weigh the evidence or second-guess the jury's determinations. The defendant argues that there's no way of knowing which particular statements investors relied on and when. But the jury was properly instructed that a statement is material if it is capable of influencing the person. So the government need not prove either that every statement was false beyond a reasonable doubt or that specific investors relied on specific statements. With that said, as I've stated, there was plenty of evidence showing that specific investors did rely on specific statements, for example, about contracts or capital. And to the extent that the objection is to the foundation, there were no objections made at trial on that respect, and even if there were, it would go to the weight, not the admissibility of the evidence. If there are no further questions, the government will just ask, based on these reasons and the reasons stated in its brief, that this court respectfully affirm the conviction and sentence. Certainly, Counsel. Anything further, Mr. Elliott? Yes, Your Honor. With respect to the point that Judge Sykes made about truthful or untruthful, and it doesn't matter because none of this would have worked, I think the record will show that some of these were, the Treasury bills, I don't think you could ever make an argument, were going to be anything. But when you look at things like the food safety through BSM, you've got Lieutenant Colonel Reed, who worked in it, who then invested in it, who said it worked. The bacterial collection, the food testing, things like this, I think, actually did work. But the representations about the contracts that were made to the victim investors, they never existed. So those were false from the start. I would say that in some cases we have to look a little farther than that, I think, Judge Sykes, and we would look something to like the Washington Metro case contracts, where, in fact, they won the RFP. Not only did they win the RFP, but then they go to Washington and they enter into contract negotiations with the Washington Metro. And unlike Chicago, where these IA mediums were going to be placed outside and hadn't been tested in cold, putting them inside a metro, I think the court can take judicial notice that it's warmer inside of a metro station than it is outside. So it's within the technological capabilities, the evidence was in the record, that it's within the technological capabilities to do this in the case of something like the Washington Metro contract. Now, that eventually fell through, but it's a contract that they won. It's a contract that they sat down and tried to negotiate. It's a contract they brought their partners to the table on. So I don't think we can say that none of this was going to work. Some of it was less likely than others, but some of it I think we have to look at a little more critically. Now, two points that counsel made. We're not arguing the credibility here. We have made no argument at all about credibility. What we're arguing about is the sufficiency of the evidence. The evidence is insufficient, and there's no requirement to object to the insufficiency of the evidence at trial. We're not raising foundation here. We're saying that the evidence wasn't sufficient, therefore the verdict cannot stand. Any further questions? As I understood her position, I could be wrong. If a question is asked of one of the investors on direct examination, what were you told about XYZ, that there was no objection from your side saying, what time are we talking about? That's how I understood it. Is she correct that there was no objection? I think that's her position, and I certainly don't mean to speak from her, but that's how I understand it. My problem with that is that I think that we were allowed to let that go and allow them to pursue that and then to claim that the evidence is insufficient. We don't have to object the insufficiency of the evidence. They didn't do their job asking the questions they should have asked. But you have to object to improperly asked questions. Well, I'm not sure it's an improperly asked question. I don't mean to sound impertinent about that. I just think it's a question that asks for one thing, but they really should have been asking for another, and it's not our job to steer them to their burden of proof. So your position would be if the government would ask a witness on a witness stand a completely improper question, like is it your opinion that this defendant is guilty beyond reasonable doubt, that you can sit back and say nothing and not object and then complain on appeal that there was an improper question? No, I don't think so, and I think that takes the argument a whole lot further than I'm willing to go. What I'm saying here is the question was, in fact, proper. The question asked for evidence that would have been relevant in this case. It just didn't loop around all the way, connect all the dots to make the connection that was required, that this investor relied on this particular evidence in order to invest. It's not that the question was wrong or improper. It just didn't complete the circle. Thank you, Counsel. Thank you. The case is taken under advisement.